# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0843-20

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

CHARLES E. LUCAS,

      Defendant-Appellant.

_____

> Submitted September 20, 2021 – Decided November 22, 2021
>
> Before Judges Fasciale and Vernoia.
>
> On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 15-07-0808.
>
> Vincent J. Sanzone, Jr., attorney for appellant.
>
> Yolanda Ciccone, Middlesex County Prosecutor, attorney for respondent (Joie Piderit, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Charles E. Lucas filed a post-conviction relief (PCR) petition challenging his conviction for first-degree aggravated sexual assault of a physically helpless victim, N.J.S.A. 2C:14-2(a)(7). Defendant claimed he had a sexual relationship with his trial counsel, and, as a result, she had a per se conflict of interest requiring PCR. He also claimed counsel became angry with him after she discovered he had relationships with other women, and, as a result of that anger, she failed to provide effective assistance of counsel during trial. He appeals from the PCR court's denial of his petition without an evidentiary hearing. Based on our review of the record and the applicable legal principles, we affirm.

I.

We summarized the trial record in our opinion affirming defendant's conviction on direct appeal, see State v. Lucas, A-4015-15 (App. Div. July 9, 2018) (slip op. at 3-7). We restate portions of that summary, and facts gleaned from the PCR record, to provide context for defendant's arguments on appeal.

A grand jury charged defendant in a 2013 indictment with violating N.J.S.A. 2C:14-2(a)(7) by committing an act of sexual penetration on K.H.

(Kate), who defendant knew or should have known was physically helpless.[1] Id. at 2. The State's theory at trial was that defendant vaginally penetrated Kate while she was intoxicated and physically helpless. Id. at 3.

The evidence showed Kate and two friends, F.H. (Fae) and defendant's girlfriend N.H. (Nancy), went to a club at 11:00 p.m. to celebrate Kate's birthday. Ibid. Kate testified that prior to going to the club, she had three drinks at Nancy's apartment. Once at the club, Kate drank mixed vodka drinks. Ibid. She testified she stopped counting the number of drinks she had at the club after her fourth or fifth, but also testified she "had only three drinks" at the club. Ibid.

After leaving the club, Kate went to Nancy's apartment, but Kate testified she "had no recollection of how she got there because she was 'too drunk.'" Id. at 3-4. Kate recalled only that when she arrived at the apartment with Fae and

---

[1] We use initials and pseudonyms to identify the victim, and some of the witnesses and individuals who were with the victim during the evening prior to, and morning of, the incident to protect the victim's privacy and because her identity is excluded from public access under Rule 1:38-3(c)(12). We also note that the original indictment charged defendant with a single count of violating N.J.S.A. 2C:14-2(a)(7). Lucas, slip op. at 7. A superseding indictment returned just before defendant's trial added three additional charges, but those charges were severed, and defendant proceeded to trial on the count alleging a violation of N.J.S.A. 2C:14-2(a)(7). Ibid. We do not address the disposition of the other charges because defendant's PCR petition challenges only his conviction for violating N.J.S.A. 2C:14-2(a)(7).

A-0843-20

Nancy, they woke her up when the car door opened, and she almost fell to the ground. Id. at 4. Kate required her friends' assistance to exit the car and climb the steps to Nancy's apartment. Ibid.

Kate had some recollection of her friends' attempts to wake her in the apartment for birthday cake. Ibid. She also recalled pushing away someone who attempted to kiss her on the lips. Ibid. She testified she could not otherwise recall what occurred in the apartment because she was "extremely drunk" and "couldn't function, couldn't stand up. Couldn't do anything for [her]self or by [her]self." Ibid.

Kate recalled waking the next morning and hearing Nancy and defendant arguing. Ibid. Kate had on the same dress she had worn the prior evening, but she was not wearing underwear. Ibid. When Nancy briefly left the apartment to go to her car, defendant told Kate that "he had sex with her but he did not want [Nancy] to know." Ibid. "[Kate] testified she had no recollection of having sex with defendant because she was 'passed out drunk on the couch.'" Ibid. She reported the incident to the police that morning, and a test later "revealed the presence of defendant's sperm in [her] vagina." Id. at 5.

Fae testified Kate drank at the club and "was 'off balance' and 'stumbling a little bit' when she danced." Ibid. According to Fae, Kate needed assistance

4

getting to the car when they left the club at about 1:45 a.m., and Kate needed assistance climbing the steps to Nancy's apartment. Ibid. Fae testified Kate fell asleep on a couch in the apartment and later needed the assistance of two friends to use the bathroom, and went back to sleep before Fae left the apartment between 3:30 a.m. and 4:00 a.m. Id. at 5-6.

N.G. (Nell) was also present at the club, where she observed that Kate was "extremely intoxicated," "incoherent," and required the assistance of "others because she could barely . . . walk or stand on her own." Ibid. Nell drove separately to Nancy's apartment and found Kate asleep on the couch when she arrived. Ibid.

Nell spent the night sleeping on the floor next to the couch. Ibid. When she awoke at around 6:00 a.m., "it appeared defendant was having sex with someone on the couch who appeared to be asleep." Ibid. Nell told defendant to stop and he "[e]ventually . . . did." Ibid. When defendant went into Nancy's bedroom, Nell noticed Kate was the person on the couch. Ibid. Nell observed that Kate was "motionless" with her "face . . . down, her dress pulled up, and her bare buttocks exposed in the air." Id. at 7. Nell pulled Kate's dress down to cover her while Kate remained motionless on the couch. Ibid. Nell told Nancy what she saw. Ibid. Nell then left the apartment. Ibid.

A-0843-20

Defendant did not present any witnesses at trial. The jury convicted him of aggravated sexual assault of Kate by vaginally penetrating her when he knew or should have known she was physically helpless. N.J.S.A. 2C:14-2(a)(7). Following our affirmance of defendant's conviction, see Lucas, slip op. at 17, the Supreme Court denied his petition for certification, State v. Lucas, 236 N.J. 611 (2019).

Defendant filed a PCR petition supported by his affidavit asserting he engaged in what he characterized as an "inappropriate relationship" with his trial counsel that began after he retained her to represent him in March 2013 on the charge for which he was later indicted and convicted. He also asserted his trial counsel was ineffective during her representation of him at his July 2015 trial.

More particularly, defendant asserted he agreed to pay counsel $25,000 in installment payments to retain her services, but he and his family members paid counsel only $2,950 during her representation of him through trial. Defendant further averred that following the commencement of his personal relationship with counsel in March 2013, they socialized, went out to dinner, exchanged text pictures and messages, had personal phone calls, and had sexual relations on four occasions, the last of which occurred in June 2015, one month before his trial began. Defendant claimed that at some undisclosed time, counsel told him

she was pregnant with his child, and she was unsure if she intended to keep the child. Defendant asserted he was "unsure of the validity of [that] claim."

Defendant also "submit[ted]" that a few days before trial the assistant prosecutor representing the State gave his counsel printouts of text messages from his phone in which he "proclaimed [his] love" for other women. Defendant asserted his counsel confronted him about the messages "in an angered manner, calling [him] a liar, and [accusing] him of playing her," and, at trial, counsel "questioned [him] about every female that appeared in court on [his] behalf and the nature of" their relationship with him. Defendant alleged that following his conviction, his counsel took his phone, obtained the passcode to the phone from him by stating his mother requested it, used the passcode to gain access to his phone, and deleted text messages he and counsel had exchanged.

Defendant averred his counsel was late to court and wore inappropriate attire during his trial. He also asserted he paid counsel $1,400 to retain a forensic toxicologist, Gary Lage, and that counsel obtained a report from Lage but never contacted him and failed to call him as a witness at trial. Defendant's affidavit does not state when he paid counsel $1,400 to retain Lage, and defendant does not assert that his counsel was ineffective by failing to timely retain Lage or obtain Lage's report.

A-0843-20

The assertions in defendant's affidavit were supplemented by arguments made on his behalf by his PCR counsel. The PCR court heard oral argument, and, in a detailed written opinion, denied defendant's petition. This appeal followed.

Defendant offers the following arguments for our consideration:

> POINT ONE
>
> THE TRIAL COURT ERRED BY NOT CONSIDERING THE DIRECT AND CIRCUMSTANTIAL EVIDENCE THAT TRIAL COUNSEL WAS ENGAGED IN A SEXUAL AFFAIR WITH THE DEFENDANT DURING HER REPRESENTATION OF THE DEFENDANT.
>
> POINT TWO
>
> THE TRIAL COURT ERRED BY HOLDING THAT THE STATE'S EVIDENCE AGAINST THE DEFENDANT WAS SO STRONG THAT THE DEFENDANT CANNOT SHOW THAT TRIAL COUNSEL'S ERRORS WOULD HAVE MADE ANY DIFFERENCE IN THE OUTCOME OF THE TRIAL.
>
> POINT THREE
>
> THE TRIAL COURT ERRED BY HOLDING THAT TRIAL COUNSEL WAS NOT INEFFECTIVE BY NOT REQUESTING THE AFFIRMATIVELY GIVEN PERMISSION CHARGE.

POINT FOUR

THE TRIAL COURT ERRED IN HOLDING THAT
TRIAL COUNSEL WAS NOT INEFFECTIVE FOR
NOT CALLING ANY WITNESSES.

POINT FIVE

THE TRIAL COURT ERRED IN HOLDING THAT
DEFENSE COUNSEL WAS NOT INEFFECTIVE
FOR FAILING TO OBJECT TO THE STATE'S
STRAW-MAN "KNOWING" ARGUMENT.

POINT SIX

THE TRIAL COURT ERRED IN HOLDING THAT
DEFENSE COUNSEL WAS NOT INEFFECTIVE BY
FAILING        TO        PRESENT        EXCULPATORY
EVIDENCE.

POINT SEVEN

THE TRIAL COURT ERRED IN HOLDING THAT
TRIAL COUNSEL WAS NOT INEFFECTIVE BY
FAILING TO CALL THE EXPERT WITNESS
REGARDING THE DISSIPATION OF ALCOHOL
WITH THE PASSAGE OF TIME.


II.

We review the legal conclusions of a PCR court de novo. State v. Harris,
181 N.J. 391, 419 (2004). The de novo standard of review also applies to mixed
questions of fact and law. Id. at 420. Where an evidentiary hearing has not been
held, it is within our authority "to conduct a de novo review of both the factual

findings and legal conclusions of the PCR court."  Id. at 421; see also State v. Lawrence, 463 N.J. Super. 518, 522 (App. Div. 2020).  We apply those standards here.

In Strickland v. Washington, 466 U.S. 668, 687 (1984), the Court established a two-part standard, later adopted by our Supreme Court in State v. Fritz, 105 N.J. 42, 58 (1987), to determine whether a defendant has been deprived of the effective assistance of counsel.  Under the standard's first prong, a petitioner must show counsel's performance was deficient by demonstrating counsel's handling of the matter "fell below an objective standard of reasonableness" and that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed [to] the defendant by the Sixth Amendment."  Strickland, 466 U.S. at 687-88.

Under the Strickland standard's second prong, a defendant must demonstrate "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id. at 687.  The petitioner "must show that the deficient performance prejudiced the defense," id. at 687, by demonstrating a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  Counsel's "error . . . must be so serious as to undermine the court's confidence

A-0843-20

in the jury's verdict or result reached." State v. Chew, 179 N.J. 186, 204 (2004) (citing Strickland, 466 U.S. at 694).

"With respect to both prongs of the Strickland test, a defendant asserting ineffective assistance of counsel on PCR bears the burden of proving his or her right to relief by a preponderance of the evidence." State v. Gaitan, 209 N.J. 339, 350 (2012) (first citing State v. Echols, 199 N.J. 344, 357 (2009); and then citing State v. Goodwin, 173 N.J. 583, 593 (2002)). A failure to satisfy either prong of the Strickland standard requires the denial of a PCR petition. Strickland, 466 U.S. at 700; State v. Nash, 212 N.J. 518, 542 (2013); Fritz, 105 N.J. at 52.

A claim of conflict of interest between a defendant and counsel is a type of ineffective assistance of counsel claim. State v. Cottle, 194 N.J. 449, 467 (2008); State v. Bellucci, 81 N.J. 531, 535 (1980). "Effective counsel must provide the client with undivided loyalty and representation that is 'untrammeled and unimpaired' by conflicting interests." State v. Norman, 151 N.J. 5, 23 (1997) (quoting Bellucci, 81 N.J. at 538). Under the Sixth Amendment, the mere "possibility" of a conflict of interest "is insufficient to impugn a criminal conviction." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980). To establish a Sixth Amendment violation, "a defendant who raised no objection at trial must

11

demonstrate that an actual conflict of interest adversely affected his lawyer's performance." Id. at 348.

"Our [Supreme] Court's rulings have exhibited a much lower tolerance for conflict-ridden representation under the New Jersey Constitution than federal courts have under the United States Constitution." Cottle, 194 N.J. at 470. When "analyzing whether a conflict of interest has deprived a defendant of his state constitutional right to the effective assistance of counsel," the Court "adhere[s] to a two-tiered approach." Id. at 467. "In those cases in which [the Court has] found a per se conflict, prejudice is presumed in the absence of a valid waiver, and the reversal of a conviction is mandated." Id. at 467. In a case where no per se conflict is shown, "the potential or actual conflict of interest must be evaluated and, if significant, a great likelihood of prejudice must be shown . . . to establish constitutionally defective representation of counsel." Id. at 467-68 (quoting Norman, 151 N.J.at 25).

Our Supreme Court has generally "limited the per se conflict on constitutional grounds to cases in which 'a private attorney, or any lawyer associated with that attorney, is involved in simultaneous dual representations of codefendants,'" or where "both [counsel] and his [or her] client are simultaneously under indictment in the same county and being prosecuted by

the same prosecutor's office."  Id. at 452, 467 (citation omitted).  The "per se analysis is reserved for those cases in which counsel's performance is so likely to prejudice the accused that it is tantamount to a complete denial of counsel." State v. Savage, 120 N.J. 594, 616 (1990).  It is "only an extraordinary deprivation of the assistance of counsel [that] triggers a presumption of prejudice."  State v. Miller, 216 N.J. 40, 70 (2013).  For a conflict of interest to trigger a per se deprivation of the right to counsel there must be an "overriding concern of divided loyalties."  Cottle, 194 N.J. at 467 n.8.

Defendant contends the court erred by rejecting his ineffective assistance of counsel claim based on its finding that his affidavit, which described his personal and sexual relationship with his counsel and counsel's purported anger at learning defendant had relationships with other women, consisted of bald assertions.  "Bald assertions" are insufficient to sustain a defendant's burden of establishing an ineffective assistance of counsel claim.  State v. Cummings, 321 N.J. Super. 154, 170 (App. Div. 1999).  A PCR petition must be "accompanied by an affidavit or certification by defendant, or by others, setting forth with particularity," State v. Jones, 219 N.J. 298, 312 (2014), "facts sufficient to demonstrate counsel's alleged substandard performance," ibid. (quoting State v. Porter, 216 N.J. 343, 355 (2013)).  "Even a suspicious or questionable affidavit

supporting a PCR petition 'must be tested for credibility and cannot be summarily rejected.'" Porter, 216 N.J. at 355 (quoting State v. Allen, 398 N.J. Super. 247, 258 (App. Div. 2008)).

Defendant's supporting affidavit includes many conclusory and bald assertions that do not constitute competent evidence.[2] However, the affidavit also includes assertions of fact supporting his claim he and his counsel had a personal and sexual relationship during her representation of him. Defendant described the nature of the relationship, when it started, and the locations and occasions he had sexual relations with trial counsel. Defendant also described counsel's alleged statements and reactions following her purported discovery of defendant's relationships with other women. Those assertions constitute statements of fact based on defendant's personal knowledge. See R. 1:6-6. The PCR court erred by concluding otherwise.

---

[2] For example, defendant asserted he "had a witness relevant to the case and character witnesses that appeared to testify on [his] behalf" but he does not identify the witnesses or provide any competent evidence in the form of an affidavit based on personal knowledge, see R. 1:6-6, from the witnesses establishing the information known to them that might have supported a defense at trial. Those assertions in his supporting certification, and others like it, constitute bald assertions because they are either conclusory or are not statements of fact based on defendant's personal knowledge.

A-0843-20

The PCR court was, and this court is, bound to consider defendant's statements of fact "in the light most favorable to [him] to determine whether [he] . . . established a prima facie [PCR] claim." Cummings, 321 N.J. Super. at 170. We therefore consider whether defendant's factual assertions support his claim that he is entitled to PCR because his personal relationship with his counsel resulted in a per se conflict of interest resulting in ineffective assistance of counsel.

Our Rules of Professional Conduct (RPC) do not explicitly prohibit sexual relationships between a lawyer and a client. See State v. Lasane, 371 N.J. Super. 151, 162 (App. Div. 2004) (noting our Supreme Court's rejection of a proposed amendment to the RPC that would have created a rule "which would have explicitly prohibited sexual relations between a lawyer and client unless a consensual relationship existed prior to the creation of the lawyer-client relationship" (citation omitted)). Nonetheless, our Supreme Court has recognized that "sexual relationships with clients jeopardize the attorney-client relationship and have the strong potential to involve the attorney in unethical behavior." In re Principato, 139 N.J. 456, 460-61 (1995); see, e.g., In re Witherspoon, 203 N.J. 343, 350 (2010) (suspending an attorney from the practice of law for violating RPC 1.7(a)(2) "by putting 'his own prurient interests

above those of his clients [thereby] creat[ing] the possibility that he would not view their matters favorably if his [sexual] advances were rejected'" (first and second alterations in original) (citation omitted)).

Here, defendant's supporting affidavit describes a personal and sexual relationship that developed after counsel started representing him. Defendant refers to his fee arrangement with counsel and the payments made toward the fee, but he does not aver that counsel bartered her legal services for his participation in their sexual relationship, or that she used her position as his counsel to exert influence over him to engage in a sexual relationship with her. Cf. Witherspoon, 203 N.J. at 360 (noting counsel's "attempt[] to barter his services for various sexual favors [constitutes] behavior that is plainly and unequivocally inappropriate").

Instead, defendant's supporting affidavit describes a lengthy relationship between two consenting adults, and his counsel's purported anger at finding he also had relationships with other women. Thus, based on the factual assertions supporting the PCR petition, defendant's counsel's alleged conflict of interest arose not because of her sexual relationship with him – which he describes in his brief on appeal as an "affair" – but because counsel became upset with defendant when she discovered he had ongoing relationships with other women

after reviewing text messages the State obtained from defendant's phone and

supplied to counsel.[3]  Defendant claims his counsel had a conflict of interest

---

[3]  In his brief on appeal, defendant argues the assistant prosecutor "improperly weaponized" the text messages obtained from defendant's phone by stating in front of the counsel with whom defendant "was having an affair" that the messages showed defendant had "multiple sexual relationships with multiple women."  Defendant's claim is unsupported by any evidence the assistant prosecutor knew of defendant's and his counsel's "affair," and, therefore there is no basis to conclude the assistant prosecutor "weaponized" the text messages to create a conflict between defendant and his counsel.  Moreover, the State was obligated to turn over the messages because they were obtained pursuant to a communications data warrant.  See R. 3:13-3(b)(1)(A) (requiring the State to provide defendants with all "electronically stored information, and any other data" in post-indictment discovery).  Additionally, the assistant prosecutor referred to the text messages only during an argument before the court concerning whether the messages could be used during the State's cross-examination of defendant if he opted to testify at trial and said he would not have vaginally penetrated Kate because he had a girlfriend at the time.  The court did not decide the issue, and defendant did not testify at trial.  Further, the record shows defendant's trial counsel disputed the State's characterization of the text messages, arguing they do not show defendant had multiple sexual relationships with various women at the same time.

Moreover, there is no evidence the text messages were from the period during which defendant had a relationship with his counsel, and the State's argument during the trial suggests they were not.  The State argued the text messages obtained from defendant's phone showing he had multiple ongoing relationships with numerous women would rebut defendant's anticipated testimony that on the date of the sexual assault, March 17, 2013, he would not have had sexual relations with Kate because he had a girlfriend.  It therefore can be reasonably inferred the text messages – which the State represented were gleaned from defendant's phone over only a nine-day period – were exchanged on or about the day of the March 17, 2013 sexual assault, and not during the period of defendant's relationship with his counsel just prior to trial.  According

17

because she was angry and felt personally betrayed by him. He argues this conflict of interest requires PCR because "the attorney-client relationship deteriorated to such a degree that trial counsel's advocacy was in serious jeopardy," and that "it has become clear to [him] that [counsel] had a personal hate for [him]" and "threw [his] case away because she was extremely jealous." Defendant did not, however, provide any facts demonstrating counsel's alleged actions resulted in ineffective assistance of counsel during trial, and defendant's claim his counsel "threw [his] case" based on "jealousy" is a bald assertion unaccompanied by facts supported by competent evidence.

The conflict of interest alleged by defendant does not fall within the two classes of cases the Court has recognized establish a per se conflict of interest. See Cottle, 194 N.J. at 452, 467. That is, defendant does not claim that his counsel was engaged in the dual representation of co-defendants, see Norman, 151 N.J. at 24-25, or that his counsel was under indictment in the same county

_____

to his affidavit, defendant first had sexual relations with his counsel on June 5, 2014, more than a year after the sexual assault, and his trial did not take place until July 2015. In any event, defendant does not include the text messages in the record on appeal, and there is no indication they were provided to the PCR court. See R. 2:6-1(a)(1)(B) and (I) (requiring appellants to include in the appendix on appeal "all docket entries in the proceedings below" and "such other parts of the record . . . as are essential to the proper consideration of the issues").

and prosecuted by the same prosecutor's office as defendant, see Cottle, 194 N.J. at 473.

Moreover, unlike in Cottle, the conflict alleged by defendant did not provide counsel with any incentive to curry favor with the prosecutor's office that was prosecuting him. See Id. at 463-64, 469 n.9. Defendant also fails to demonstrate "a significant risk" that trial counsel's representation was "materially limited" by her "personal interest." See RPC 1.7(a)(2). Nor has defendant demonstrated the "great likelihood of prejudice" required to "establish constitutionally defective representation of counsel." Cottle, 194 N.J. at 467-68 (citation omitted). The facts proffered by defendant simply do not demonstrate "an extraordinary deprivation of the assistance of counsel [that] triggers a presumption of prejudice," Miller, 216 N.J. at 70, or raise an "overriding concern of divided loyalties," Cottle, 194 N.J. at 467 n.8; cf. Lasane, 371 N.J. Super. at 164-65. (finding ineffective assistance of counsel in part based on plea counsel's divided loyalties where juvenile defendant pleaded guilty to felony murder at the urging of his counsel and his mother, with whom plea counsel engaged in a sexual relationship).

We therefore reject defendant's claim that his personal and sexual relationship with his counsel constituted a per se conflict requiring PCR. See,

e.g., United States v. Babbitt, 26 M.J. 157, 158-59 (C.M.A. 1988) (refusing to adopt a per se rule that a defendant's right to the effective assistance of counsel is violated where the defendant and her counsel had sexual intercourse while he represented her, and rejecting defendant's ineffective assistance of counsel claim because she did not prove her counsel was "serious[ly] incompeten[t]" or that she was prejudiced by the representation); Hernandez v. State, 750 So. 2d 50, 55 (Fla. Ct. App. 1999) (denying PCR where the defendant's trial counsel had a sexual relationship with the defendant's wife, but the defendant could not prove the relationship adversely effected trial counsel's performance during trial); Barentine v. United States, 728 F. Supp. 1241, 1252 (W.D.N.C. 1989) (finding a potential conflict of interest when the defendant's trial counsel had a sexual relationship with the defendant's paramour, but nevertheless determining the defendant did not establish an ineffective assistance of counsel claim because he did not prove prejudice), aff'd o.b., 908 F.2d 968 (4th Cir. 1990).

## III.

As noted, where a defendant fails to establish a per se conflict, he or she must demonstrate the conflict is "significant" and there is "a great likelihood of prejudice" to establish ineffective assistance of counsel. Cottle, 194 N.J. at 467-68 (quoting Norman, 151 N.J. at 25). Defendant contends he is entitled to PCR

because he made a prima facie case of ineffective assistance of counsel under the Strickland standard. See Strickland, 466 U.S. at 687-88. He argues the PCR court erred by rejecting his various claims that his counsel's performance at trial was constitutionally deficient and that but for his counsel's errors there is a reasonable probability the result of his trial would have been different. See id. at 687-88, 695. We address defendant's claims in turn.[4]

## A.

Defendant argues his counsel was ineffective by failing to request what he characterizes as an "affirmatively given permission charge." Defendant asserts it is "undisputed" that Kate's physical actions demonstrated she "affirmative[ly] consent[ed]" to defendant's vaginal penetration of her, and that, as a result, his counsel erred by failing to request the affirmatively-given-permission charge.

"[A]ppropriate and proper jury charges are essential to a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553,

---

[4] Defendant claimed before the PCR court that his counsel's performance was constitutionally deficient in numerous and varied ways. The PCR court rejected each of his claims. We do not address all the claims defendant made before the PCR court, but instead limit our analysis to only the claims addressed by defendant in his brief on appeal. See Jefferson Loan Co. v. Session, 397 N.J. Super. 520, 525 n.4 (App. Div. 2008) (finding issues not briefed on appeal are deemed waived).

A-0843-20

613 (2004)). "The trial court must give 'a comprehensible explanation of the questions that the jury must determine, including the law of the case applicable to the facts that the jury may find.'" Id. at 159 (quoting State v. Green, 86 N.J. 281, 287-88 (1981)). "Thus, the court has an 'independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either party.'" Ibid. (alteration in original) (quoting Reddish, 181 N.J. at 613).

A "party is [not] entitled to have the jury charged in his or her own words; all that is necessary is that the charge as a whole be accurate." State v. Jordan, 147 N.J. 409, 422 (1997). There is also a presumption of correctness in the model jury charges. See State v. R.B., 183 N.J. 308, 325 (2005) (explaining the trial court's obligation to deliver model charges); Mogull v. CB Com. Real Est. Grp., Inc., 162 N.J. 449, 466 (2000) (noting "[i]t is difficult to find that a charge that follows the Model Charge so closely constitutes plain error").

On his direct appeal, defendant argued there were errors in the jury instructions concerning the offense charged in the indictment under N.J.S.A. 2C:14-2(a)(7). The court instructed the jury in accordance with the Model Jury charge – Model Jury Charges (Criminal), "Aggravated Sexual Assault (Mentally Incapacitated) (N.J.S.A. 2C:14-2(a)(7))" (rev. Feb. 6, 2012) – applicable to the

offense for which defendant was tried. We found no error in the court's instruction, Lucas, slip. op. at 10-11, and the court's use of a Model Jury Charge "is a persuasive argument in favor of the charge as delivered," State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000)).

Defendant's current claim the jury instruction should have included an affirmatively-given-permission charge, is procedurally barred because it could been raised on direct appeal, and defendant makes no showing the PCR court's rejection of the claim is contrary to a new rule of constitutional law. Thus, the claim is barred under Rule 3:22-4(a)(1) to (2). See State v. Szemple, 247 N.J. 82, 98 (2021) ("Rule 3:22-4(a) bars petitions that rely on grounds that reasonably have been – but were not – raised during direct appeal, unless an exception applies."). The claim is also barred because defendant makes no showing that denial of his ineffective assistance of counsel claim based on that ground for relief – which could have been raised on defendant's direct appeal – will "result in a fundamental injustice." R. 3:22-4(a)(2); see State v. Hannah, 248 N.J. 148, 179 (2021) (explaining "[a] fundamental injustice occurs 'when the judicial system has denied a "defendant with fair proceedings leading to a just outcome"

or when "inadvertent errors mistakenly impacted a determination of guilt or otherwise wrought a miscarriage of justice"'" (quoting Nash, 212 N.J. at 148)).

Even if the claim was not procedurally barred, defendant is not entitled to PCR under the Strickland standard because he has not demonstrated counsel's failure to request the charge amounted to a constitutionally deficient performance, or that the failure to include the charge prejudiced defendant.

What defendant characterizes as the affirmatively-given-permission charge is included in the Model Jury charges for aggravated sexual assault under N.J.S.A. 2C:14-2(a)(6).[5]   See Model Jury Charges (Criminal), "Aggravated Sexual Assault—Physical Force or Coercion with Severe Personal Injury (N.J.S.A. 2C:14-2(a)(6))" (rev. Sept. 8, 2008).   The affirmatively-given-permission charge defendant contends his counsel should have requested is as follows:

> Physical force is defined as the commission of the act of sexual penetration without the victim's freely and affirmatively given permission to the specific act of penetration alleged to have occurred.  You must decide whether the defendant's alleged act of penetration was undertaken in circumstances that led the defendant reasonably to believe that the victim had

---

[5]  The identical affirmatively-given-permission charge is also included in the Model Jury Charge for sexual assault under N.J.S.A. 2C:14-2(c)(1). See Model Jury Charges (Criminal), "Sexual Assault (Force/Coercion) (N.J.S.A. 2C:14-2(c)(1))" (rev. Jan. 24, 2005).

freely given affirmative permission to the specific act of sexual penetration. Simply put, affirmatively given permission means the victim did or said something which would lead a reasonable person to believe [he/she] was agreeing to engage in the act of sexual penetration, and freely given permission means the victim agreed of [his/her] own free will to engage in the act of sexual penetration. Freely and affirmatively given permission can be indicated either through words or through actions that, when viewed in the light of all the surrounding circumstances, would demonstrate to a reasonable person that affirmative and freely given permission for the specific act of sexual penetration had been given.

Persons need not, of course, expressly announce their consent to engage in an act of sexual intercourse for there to be affirmative permission. Permission to engage in an act of sexual penetration can be and indeed often is indicated through physical actions rather than words. Permission is demonstrated when the evidence, in whatever form, is sufficient to demonstrate that a reasonable person would have believed that the alleged victim had affirmatively and freely given authorization to the act.

Proof that the act of sexual penetration occurred without the victim's permission can be based on evidence of conduct or words in light of surrounding circumstances, and must demonstrate beyond a reasonable doubt that a reasonable person would not have believed that there was affirmative and freely given permission. If there is evidence to suggest that the defendant reasonably believed that such permission had been given, the State must demonstrate beyond a reasonable doubt either that the defendant did not actually believe that such permission had been freely

25

given, or that such a belief was unreasonable under all of the circumstances.

In determining the reasonableness of defendant's belief that the victim had freely given affirmative permission, you must keep in mind that the law places no burden on the alleged victim to have expressed non-consent or to have denied permission. You should not speculate as to what the alleged victim thought or desired or why [he/she] did not resist or protest. The State is not required to prove that the victim resisted.

[Model Jury Charges (Criminal), "Aggravated Sexual Assault—Physical Force or Coercion with Severe Personal Injury (N.J.S.A. 2C:14-2(a)(6))" (rev. Sept. 8, 2008) (footnote omitted).]

This language in the charge for an offense under N.J.S.A. 2C:14-2(a)(6) is employed for a singular purpose: it defines an essential element of that crime – "physical force."[6] Ibid. In State in Interest of M.T.S., the Court explained that "[t]he definition of 'physical force is satisfied under N.J.S.A. 2C:14-2[(c)](1) if the defendant appli[ed] any amount of force against another person in the absence of what a reasonable person would believe to be affirmative and freely-

---

[6] The affirmatively-given-permission charge defendant contends his trial counsel should have requested is also included in the Model Jury charge for the offense of sexual assault under N.J.S.A. 2C:14-2(c)(1) to define the same element of that offense – "physical force or coercion." See Model Jury Charges (Criminal), "Sexual Assault (Force/Coercion) (N.J.S.A. 2C:14-2(c)(1))" (rev. Jan. 24, 2005).

26

given permission to the act of sexual penetration."  129 N.J. 422, 444 (1992). As the Court more recently explained in C.R. v. M.T., ___ N.J. ___, ___ (2021) (slip op. at 21-22), in 2020 the Legislature amended N.J.S.A. 2C:14-2 by replacing the term "physical force" and replacing it with the definition provided by the Court in M.T.S.  See L. 2019, c. 474, § 1 (effective January 21, 2020).

Defendant was not charged with, or convicted of, an offense under N.J.S.A. 2C:14-2(a)(6), or of any crime that includes physical force as an element.  He was charged and convicted of a wholly separate offense under N.J.S.A. 2C:14-2(a)(7).  In pertinent part, N.J.S.A. 2C:14-2(a)(7) defines the offense for which defendant was convicted as follows:  "an actor is guilty of aggravated sexual assault if the actor commits an act of sexual penetration with another person" where "[t]he victim, at the time of sexual penetration, is one whom the actor knew or should have known was . . . physically helpless." N.J.S.A. 2C:14-2(a)(7)(a).  A person is "physically helpless" when he or she "is unconscious or is physically unable to flee or is physically unable to communicate unwillingness to act."  N.J.S.A. 2C:14-1(g).  Thus, by definition, a person who is physically helpless is unable to freely and affirmatively consent because he or she lacks the ability to "communicate unwillingness to act."  Ibid.

A person who is asleep meets the statutory definition of "physically helpless." See State v. Rush, 278 N.J. Super. 44, 49 (App. Div. 1994).

The evidence presented at trial established Kate was physically helpless during the time defendant vaginally penetrated her. See, e.g., id. at 47-48. "[A] person who is lacking sensory perception and is unable to perform any controlled function, including the communication of a lack of consent, meets the definition of physical helplessness" under N.J.S.A. 2C:14-2(a)(7). Ibid. The jury found beyond a reasonable doubt that Kate was physically helpless, and we determined the court properly instructed the jury instruction on the elements of the offense, including the element of physical helplessness. See Lucas, slip op. at 7-11.

Trial counsel was not ineffective by failing to request an affirmatively given permission charge because there was no rational basis in the law supporting the charge. See Chew, 179 N.J. at 215 (finding counsel's performance was not constitutionally deficient by failing to request a jury charge on accomplice liability because there was no rational basis for the charge and, as a result, the failure to request the charge was not prejudicial). As noted, the affirmatively-given-permission charge defines "physical force or coercion," which is not an element of the crime under N.J.S.A. 2C:14-2(a)(7), the crime

charged against defendant. The State was not required to establish defendant used force or coercion, and therefore an affirmatively-given-permission charge defining an element of other offenses under N.J.S.A. 2C:14-2 is inapposite here.[7]

Defendant failed to sustain his burden under Strickland's first prong because his trial counsel was not ineffective by failing to request a jury charge that was unsupported by the evidence or the law. See, e.g., Chew, 179 N.J. at 215. He also failed to satisfy Strickland's second prong because he could not have suffered prejudice based on his counsel's failure to request an inapposite jury charge. See ibid. The court correctly rejected defendant's claim he was entitled to PCR based on his counsel's decision not to request the affirmatively-given-consent charge.

## B.

Defendant also claims counsel was ineffective by failing to call witnesses on his behalf at trial. He argues counsel's decision not to call any witnesses deprived the jury from considering his testimony, and the testimony of "other

---

[7] Defendant also argues the physical positioning of Kate's body, "with her buttocks raised . . . and not moving," supports a finding Kate "consciously moved into the lordosis position []and did so as a voluntary act under her conscious control." We reject the argument because it is based wholly on speculation. There is no evidence Kate "consciously moved" into that position, and the uncontradicted evidence established Kate was either asleep or unconscious as defendant vaginally penetrated her and immediately thereafter.

witnesses that he wanted to present," including his expert Lage. Defendant further argues counsel should have called Kate's estranged husband, L.H., and Kate's brother-in-law, R.L.W., because they would have testified Kate made false accusations of sexual assault in the past.

"Determining which witnesses" to subpoena to testify "is one of the most difficult strategic decisions that any trial attorney must confront." State v. Arthur, 184 N.J. 307, 320 (2005).

> A trial attorney must consider what testimony a witness can be expected to give, whether the witness's testimony will be subject to effective impeachment by prior inconsistent statements or other means, whether the witness is likely to contradict the testimony of other witnesses the attorney intends to present and thereby undermine their credibility, whether the trier of fact is likely to find the witness credible, and a variety of other tangible and intangible factors. Therefore, like other aspects of trial representation, a defense attorney's decision concerning which witnesses to call to the stand is "an art," and a court's review of such a decision should be "highly deferential."
>
> [Id. at 320-21 (citations omitted) (quoting Strickland, 466 U.S. at 693).]

We must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting

30

Michel v. Louisiana, 350 U.S. 91, 101 (1955)). When a defendant asserts his attorney failed to call exculpatory witnesses, "he must assert the facts that would have been revealed, 'supported by affidavits or certifications based upon the personal knowledge of the affiant or the person making the certification.'" State v. Petrozelli, 351 N.J. Super. 14, 23 (App. Div. 2002) (quoting Cummings, 321 N.J. Super. at 170). Counsel is not constitutionally ineffective by failing to call witnesses at a hearing whose testimony would not change the outcome. State v. Bey, 161 N.J. 233, 262 (1999).

Measured against these principles, we reject defendant's claim his counsel's performance was deficient by failing to call defendant, and other unidentified witnesses, at trial. In support of his PCR petition, defendant did not provide an affidavit or certification based on personal knowledge establishing what he or the other unidentified, putative witnesses would have testified to at trial. Defendant's supporting affidavit does not include any facts concerning the incident with Kate or whether she was physically helpless when he vaginally penetrated her, or that would have supported a defense to the charge against him. Thus, his claims counsel erred by failing to call him and the unidentified individuals as witnesses constitutes a bald assertion insufficient to

satisfy his burden under both prongs of the Strickland standard. See Petrozelli, 351 N.J. Super. at 23; Cummings, 321 N.J. Super. at 170.

We are also unpersuaded by defendant's argument the PCR court erred by rejecting his claim that his counsel was ineffective by failing to call Kate's estranged husband and his brother as witnesses at trial. Following defendant's conviction, Kate's estranged husband and his brother provided certifications asserting Kate made false accusation of sexual assault in the past. Defendant argued the putative testimony of Kate's estranged husband and his brother could have been properly used to challenge Kate's credibility.

The certifications were submitted to the court in support of defendant's new-trial motion. Defendant argued the certifications satisfied the standard for a new trial based on newly discovered evidence established in State v. Carter, 85 N.J. 300, 314 (1981). That is, defendant claimed the evidence was "material," was "of the sort that would probably change the jury's verdict" at a new trial, and the information in the certifications was "discovered since the trial and not discoverable by reasonable diligence beforehand." See ibid.; see also Lucas, slip. op. at 12-13.

The trial court denied the motion, finding that "whether [Kate] falsely accused others of sexual assault was irrelevant because her credibility in this

matter was immaterial." Lucas, slip op. at 13. The trial court reasoned that Kate's credibility was immaterial because she had no memory of the sexual assault and the testimony concerning the assault was provided by Nell. Id. at 14. The trial court further found there was overwhelming evidence of Kate's intoxication and "unresponsive state" as defendant vaginally penetrated her such that "undermining [Kate's] credibility would not be material to the issues in evidence in the case." Id. at 15. We agreed with the trial court's reasoning, concluded "defendant failed to fulfill the three elements in Carter," and determined defendant offered "no basis to order a new trial." Ibid.

In support of his PCR petition, defendant asserted trial counsel's performance was deficient because, based on the information in the post-trial certifications, she failed to call at trial Kate's estranged husband and his brother. A trial counsel must perform a reasonable investigation of a defendant's case. Porter, 216 N.J. at 353. However, defendant does not claim, and does not offer any facts establishing, counsel failed to conduct a reasonable investigation or that counsel would have discovered the information later disclosed in the certifications during a reasonable pretrial investigation. Defendant does not offer any facts establishing his counsel had any reason to investigate if Kate had made false sexual assault allegations against her estranged husband or his

A-0843-20

brother. Without such facts, there is no basis to conclude trial counsel's performance was deficient by failing to discover through a pretrial investigation that Kate had allegedly made prior false claims of sexual assault against her estranged husband and his brother.

Moreover, missing from defendant's claim his counsel's performance was deficient is any evidence trial counsel knew, or through the exercise of reasonable diligence would have known, that those individuals had that information. Indeed, defendant recognized his counsel had no reason to investigate the two putative witnesses; as noted, he argued in support of his new-trial motion that the information from the two individual could not have been discovered by his counsel prior to trial through the exercise of reasonable diligence.[8] See Carter, 85 N.J. at 314.

---

[8] On appeal, defendant argues in its decision on the new-trial motion, the court found that the information provided in the post-trial certifications of Kate's estranged husband and his brother "was readily discoverable before trial." The argument is not supported by the record. The new-trial motion, in part, was based on purported newly discovered information provided by defendant's girlfriend, Nancy. The motion court noted that Nancy was listed as a trial witness by both the State and defendant, and therefore any information she might have possessed "could have been discovered prior to trial." In a comment that is unsupported by any competent evidence, the court also stated that "with regard to the other witnesses," including Kate's estranged husband and his brother, it "appears . . . most likely . . . that their testimony could have been discovered prior to trial." We find the court's comment devoid of support in competent

We reject defendant's PCR claim because his counsel's performance was not deficient by failing to call two witnesses – Kate's estranged husband and his brother – about whom counsel would not have known, even through the exercise of reasonable diligence, to have information relevant to Kate's credibility or the sexual assault for which defendant was charged. A trial counsel's performance is not constitutionally deficient by failing to discover information that might have assisted the defense at trial, but about which counsel was unaware or had no reason to investigate. See, e.g., Dooley v. Petsock, 816 F.2d 885, 891 (3d. Cir. 1987), cert. denied, 484 U.S. 863 (1987) (stating "[a] trial counsel cannot be ineffective for failing to raise claims as to which his client has neglected to supply the essential underlying facts when those facts are within the client's possession; clairvoyance is not required of effective trial counsel").

Defendant therefore failed to satisfy Strickland's first prong on his claim trial counsel was ineffective by failing to call those two witnesses. See

---

evidence establishing a reasonably diligent investigation of the case would not have yielded the information Kate's estranged husband and his brother apparently volunteered following defendant's conviction. And, in defendant's affidavit and the record submitted in support of his PCR petition, there is no competent evidence establishing defendant's trial counsel failed to conduct a reasonable investigation that would have resulted in the discovery of the information from the two putative witnesses. Again, as noted, defendant did not, and does not, argue otherwise. Defendant argues only that trial counsel failed to call the two witnesses at trial.

A-0843-20

Strickland, 466 U.S. at 687 (explaining a petitioner must establish both prongs of the Strickland standard to obtain a reversal of the challenged conviction); Nash, 212 N.J. at 542 (same). For that reason alone, we affirm the court's rejection of defendant's PCR claim that his counsel was ineffective by failing to call Kate's estranged husband and his brother as witnesses at trial.

Defendant's claim also fails for the separate but equally dispositive reason that he cannot establish there is a reasonable probability that but for his counsel's purported error in failing to call the two witnesses, the result of his trial would have been different. See Strickland, 466 U.S. at 694. That is because we determined on defendant's direct appeal that the motion court correctly found the testimony of the two witnesses was not material to the issues in the case, due to "overwhelming proof of the victim's intoxication and unresponsive state coming from the . . . testimony of others." Lucas, slip op. at 15; see also State v. Preciose, 129 N.J. 451, 476 (1992) (explaining "a prior adjudication on the merits ordinarily constitutes a procedural bar to the reassertion of the same ground as a basis for post-conviction review"). Thus, even assuming counsel erred by failing to call the two witnesses, defendant could not have suffered any prejudice under Strickland's second prong.

A-0843-20

We next consider defendant's claim his counsel was ineffective by failing to call his expert witness, Lage, at trial. Defendant argues Lage would have testified in accordance with his expert's report – which is dated July 10, 2015, four days before the start of defendant's trial. In his report, Lage opines that Kate's blood alcohol content would have been sufficiently diminished such that she "could not have been physically helpless at 6:00 a.m." when defendant was observed vaginally penetrating her. Defendant contends that opinion testimony, if presented at trial, would have raised a "reasonable doubt[] to the jury that Kate was faking when she got caught having consensual coitus with" defendant.

Defendant does not argue trial counsel's performance was deficient by failing to timely obtain Lage's report prior to trial. Defendant's claim is based solely on the premise his counsel obtained the report and failed to call Lage as a witness. Defendant, however, failed to provide any competent evidence Lage provided the report to counsel prior to trial or that trial counsel actually received the report prior to trial. Defendant did not submit an affidavit from Lage establishing his delivery of the report to counsel or establishing that either he or his counsel received the report prior to the trial. And the mere fact the report is dated four days prior to the start of the trial, and is addressed to defendant's

37

counsel, does not establish it was either sent to defendant's counsel or that she received it.

The PCR court observed that the report was untimely because it was dated four days prior to trial, and Rule 3:13-3 requires the submission of expert's report thirty days in advance of trial. The Rule further provides that where a report is not timely submitted, the expert may be barred from testifying at trial "upon application by the prosecutor." R. 3:13-3. Defendant does not claim his counsel's performance was deficient by failing to move for leave to serve the untimely report, and the PCR court did not determine that the untimeliness of the report would have resulted in an order barring Lage from testifying at trial. We therefore do not consider whether the untimeliness of Lage's report alone – which defendant does not claim resulted from any error by his counsel – requires a rejection of his PCR claim because his counsel's performance would not have been deficient by failing to call an expert witness who might have been barred from testifying under Rule 3:13-3.

Even assuming the report was delivered to defendant's counsel prior to trial, and the court would not have barred Lage's testimony under Rule 3:13-3, defendant's PCR claim fails because defendant did not provide any competent evidence establishing what Lage would have testified to at trial in accordance

with the report.  Lage's expert report constitutes inadmissible hearsay, <u>Corcoran</u> <u>v. Sears Roebuck & Co.</u>, 312 N.J. Super. 117, 126 (App. Div. 1998), and it therefore neither constitutes competent evidence establishing any facts supporting defendant's PCR petition nor that Lage would have testified in accordance with the report at trial, <u>see</u> <u>Cummings</u>, 321 N.J. Super. at 170 (explaining a petitioner's bald assertions are insufficient to support a PCR claim because the facts supporting a PCR claim must be "supported by affidavits or certifications based upon . . . personal knowledge").  As a result, defendant failed to sustain his burden of presenting competent evidence as to what Lage would have testified to at trial and, in that failure, defendant did not establish either that his counsel's performance was deficient or that he suffered any prejudice by Lage's absence as a witness at trial.

Moreover, even if it could be assumed Lage would have testified in accordance with his report, defendant failed to present facts establishing either that his counsel's performance was deficient by failing to call Lage as a witness or that he suffered prejudice under the <u>Strickland</u> standard by failing to call Lage as a witness.  As noted, "a defense attorney's decision concerning which witnesses to call to the stand is 'an art,' and a court's review of such a decision should be 'highly deferential.'"  <u>Arthur</u>, 184 N.J. at 320 (citation omitted)

(quoting Strickland, 466 U.S. at 693, 698). Further, we must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel, 350 U.S. at 101). Counsel is not constitutionally ineffective by failing to call witnesses whose testimony would not change the outcome. Bey, 161 N.J. at 262.

Here, trial counsel was confronted with substantial evidence establishing defendant's guilt. See Lucas, slip op. at 15 (finding the trial record included "overwhelming proof of" Kate's "intoxication and unresponsive state"). DNA evidence showed defendant vaginally penetrated Kate. The testimony of Kate, Fae, and Nell, as well as the video recordings of Kate, demonstrated the physical impairments Kate suffered from her consumption of alcohol. Perhaps most significant, Nell, a reluctant witness with no apparent reason to fabricate the facts, testified she saw defendant sexually penetrating Kate, while Kate was immobile and in a state of what is properly characterized as unconsciousness. Kate's testimony that she had no memory of the incident further supported the State's claim she was physically helpless when the sexual assault occurred.

The record plainly reveals trial counsel's strategy. She challenged the witnesses' recollections and the credibility of their testimony concerning Kate's consumption of alcohol and the level of her alleged intoxication at 6:00 a.m., when the incident occurred. Counsel further developed evidence that during the time immediately following the incident, Kate acted and spoke in a manner wholly inconsistent with a finding she was physically helpless a very short time earlier when the incident occurred. For example, counsel focused on Kate's conversation with Nell immediately following the incident, Kate's discussion with defendant during which she expressed concern about the possibility of having been impregnated, and the fact that Kate drove home from Nancy's house within thirty minutes of the incident.

Counsel argued that evidence established Kate not only was no longer intoxicated to such a degree that she was physically helpless, but rather Kate intentionally feigned physical helplessness during the incident once she realized Nell observed her having consensual sexual relations with defendant. Trial counsel's strategy was to demonstrate that Kate's actions were inconsistent with a finding beyond a reasonable doubt that she was physically helpless as the result of intoxication at 6:00 a.m. when Nell saw defendant vaginally penetrating Kate. Trial counsel argued Kate purposely feigned the immobility Nell thought she

41

observed, as well as her purported lack of memory of the incident, because Kate did not wish to admit she had been caught having consensual sexual relations with defendant in the home of her friend Nancy, who was defendant's girlfriend.

When viewed in that context, we are not convinced trial counsel's performance was deficient by not calling Lage as an expert witness. Trial counsel's strategy was to cast reasonable doubt on the State's claim Kate was physically helpless due to her intoxication. Lage's finding Kate suffered from alcohol induced amnesia is inconsistent with counsel's strategy of establishing Kate was no longer under the influence of alcohol, and was therefore not physically helpless when defendant vaginally penetrated her. Indeed, Lage's report includes the conclusion that Kate "would have had a sufficient alcohol consumption and blood alcohol level . . . to render her under the influence of alcohol and also to have produced alcohol-induced amnesia to the events that occurred." That conclusion is inconsistent with counsel's strategy, supported by other record evidence, of claiming Kate was not under the influence of alcohol at 6:00 a.m., was not physically helpless when defendant vaginally penetrated her, and was sufficiently alert to immediately feign physical helplessness after Nell observed what was a consensual sexual interaction with defendant.

A-0843-20

Defendant also argues Lage would have provided testimony about Kate's blood alcohol content and level of intoxication at 6:00 a.m. that would have undermined the State's claim Kate was sufficiently intoxicated at the time to be physically helpless. To the extent Lage's report suggests such possible testimony, the opinions in his report are inadmissible as net opinions. See generally Townsend v. Pierre, 221 N.J. 36, 53-54 (2015) (explaining "the net opinion rule" and the requirements for admission of an expert opinion under N.J.R.E. 703).

Lage's discussion of Kate's blood alcohol content is founded on supposition; for example, he notes the amount of Kate's "alcohol consumption" upon which his opinion is based "is not totally clear." He also bases his generic analysis of blood alcohol content levels on a "typical alcoholic beverage" without regard to the type of drinks Kate consumed and the evidence showing she consumed drinks consisting of multiple alcoholic beverages. Last, Lage's putative assessment of Kate's blood alcohol content, and the effect of various blood alcohol contents on an individual's behavior, are untethered to any established scientific standard or reference, and thus constitute personal opinions that are inadmissible net opinions. See Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 373 (2011) (explaining an expert offers an

inadmissible net opinion when he or she does not "offer an objective support for his or her opinion[], but testifies only to a view about a standard that is 'personal'" (citation omitted)).

Defendant's reliance on Lage's report concerning Kate's level of intoxication is misplaced because his putative opinions, as expressed in the report, would have been inadmissible at trial. See Pierre, 221 N.J. at 55 ("The net opinion rule . . . mandates that experts 'be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are reliable.'" (citation omitted)). Defendant's counsel was not ineffective by failing to call an expert at trial whose testimony would have been excluded as an inadmissible net opinion.

In sum, we are convinced defendant failed to satisfy Strickland's first prong on his claim his counsel was ineffective by failing to call Lage as a witness at trial. For that reason alone, we affirm the court's denial of defendant's PCR claim that his counsel was ineffective by failing to call Lage as a witness at trial. See Strickland, 466 U.S. at 700 (explaining a failure to satisfy either prong of the Strickland standard requires the denial of a petition for PCR); see also Nash, 212 N.J. at 542 (same).

44

We also affirm the order denying the claim because, even assuming counsel erred by not calling Lage as a witness, defendant failed to establish that but for the error there is a reasonable probability the result of his trial would have been different. Strickland, 466 U.S. at 694. As we have explained, Lage's putative testimony would have undermined the defense, or would have otherwise been inadmissible as net opinion. Thus, we discern no basis to conclude that the result of defendant's trial would have been different if Lage had been called as a witness. Defendant had an affirmative duty to prove prejudice, State v. Gideon, 244 N.J. 538, 551 (2021), and he failed to sustain that burden.

Defendant's remaining arguments, to the extent we have not directly addressed them, are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0843-20